IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| KAISER FOUNDATION HEALTH PLAN, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE QUEEN'S MEDICAL CENTER, INC., *et al.*, <br><br> Defendants. | Case No. 19-cv-00301-DKW-WRP <br><br> **ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS, (2) DENYING AS MOOT PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION, AND (3) DISMISSING THIS CASE WITHOUT LEAVE TO AMEND** |

This litigation arises following the breakdown of a contractual relationship between Kaiser, a health maintenance organization, and Defendants, various hospitals in the State of Hawai‘i.   That breakdown may put Kaiser's members in the position of being billed the balance for emergency services they receive while in Defendants' care.

Pending before the Court are two motions that, although seeking different relief, present, at least in part, similar arguments.   First, Defendants The Queen's Medical Center, Inc., North Hawai‘i Community Hospital, Inc., and Molokai General Hospital (collectively, QMC or Defendants) argue that, because each of Kaiser's claims depends on the existence of a contract between QMC and Kaiser, and because no such contract exists, this entire action must be dismissed.   Second,

Kaiser moves for an injunction, seeking to put an end to QMC's threat to balance bill Kaiser's members.   Kaiser argues that it has an implied contract with QMC, and, even if it did not, QMC should not be able to bill Kaiser's members for the balance of unpaid emergency services.

The Court has thoroughly reviewed the parties' briefs and supporting materials and carefully considered the legal principles relevant to the same.   Having done so, the Court agrees with QMC that no implied in-fact contract exists with Kaiser relating to the provision of emergency services, and neither Hawaiʻi law nor the common law create an implied in-law contract between the parties under the facts presented here.   The Court further agrees with QMC that the absence of a contract between the parties mandates the dismissal of each of Kaiser's claims, including the claims based upon balance billing.   Further, because Kaiser's claims must be dismissed, its request for injunctive relief is DENIED AS MOOT.   Finally, the Court finds that leave to amend would be futile, as no amendment would be able to cure the deficiencies discussed below.   As a result, this case is DISMISSED WITH PREJUDICE.

## PROCEDURAL BACKGROUND

This case began on June 12, 2019 with the filing of the Complaint against Defendants.   Dkt. No. 1.   Attached to the Complaint is a letter, dated June 3, 2019, from QMC to Kaiser.   Dkt. No. 1-1.   On August 13, 2019, QMC filed a motion to

dismiss the Complaint with prejudice.   Dkt. No. 18.   Before any responsive briefing on the motion to dismiss, on August 22, 2019, Kaiser filed a motion for temporary restraining order and for preliminary injunction ("the motion for a preliminary injunction").   Dkt. No. 29.   Attached to the motion for a preliminary injunction are numerous exhibits and declarations.   Dkt. Nos. 29-2 to 26.   After a conference with the parties, briefing with respect to both of the foregoing motions was placed on identical tracks.   Dkt. No. 38.   On September 6, 2019, both sides filed opposition papers to the respective motions, as well as exhibits attached thereto.   *See generally* Dkt. Nos. 44, 46.   On September 12, 2019, replies in support of the respective motions were filed.   Dkt. Nos. 53, 54.

At the same time that the foregoing briefing was taking place, the parties also agreed to undertake mediation with, *inter alia*, Magistrate Judge Kevin Chang. Dkt. No. 38.   Following two separate mediation sessions, though, no settlement was reached.   Dkt. Nos. 57, 59.   As a result, with the agreement of counsel, a hearing on the motion to dismiss and the motion for a preliminary injunction was set for, and took place, on October 23, 2019.   Dkt. Nos. 60, 61.   This Order follows.

## STANDARD OF REVIEW

### I.   Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."   Rule

12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Pursuant to *Ashcroft v. Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not show that the pleader is entitled to relief as required by Rule 8(a)(2). *Id*. at 679.

When a complaint fails to state a plausible claim, leave to amend should be given when "justice so requires." Fed.R.Civ.P. 15(a)(2). Justice does not require leave to amend when (1) it would prejudice an opposing party, (2) it is sought in bad faith, (3) it would produce an undue delay in litigation, (4) it would be futile, or (5) there has been repeated failure to cure a deficiency. *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008); *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

## II.   Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[1]   When a party "has not shown any chance of success on the merits, no further determination of irreparable harm or balancing of hardships is necessary." *Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007).

## DISCUSSION

While the parties' motions collectively present many issues, not all of them require resolution.[2]   The most significant issue, suggested in part by the time and briefing space each side has allotted, is whether a contract exists between Kaiser and QMC.   The Court accordingly addresses that issue first and then addresses the effect of its contract determinations on each of Kaiser's four claims.

## I.   A Contract or Not?

The parties agree that there are two potential principles through which Kaiser and QMC could be considered to be in a contractual relationship: (1) an implied

---

[1]The standards for a temporary restraining order and a preliminary injunction are substantially the same.   *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001), *overruled on other grounds by Winter*, 555 U.S. at 20.

[2]For instance, QMC asserts that Kaiser lacks standing to bring this case and that this proves fatal to each of Kaiser's claims.   Dkt. No. 18-1 at 2-3, 22-26.   In light of the Court's rulings, *infra*, the Court finds it unnecessary to reach QMC's standing contentions.

in-fact contract; and/or (2) an implied in-law contract.[3]   The Court therefore

addresses each.

## A.   **Implied In-Fact**

Both Kaiser and QMC rely on the same legal construct as to when an implied

in-fact contract exists under Hawaiʻi law.   That construct comes from *Durette v.*

*Aloha Plastic Recycling, Inc.*, 100 P.3d 60 (Haw. 2004).   *See* Dkt. No. 18-1 at 10;

Dkt. No. 46 at 13.   In *Durette*, the Hawaiʻi Supreme Court explained the principle

of an implied contract as follows:

> Implied contracts arise under circumstances which, according to the
> ordinary course of dealing and the common understanding of men,
> show a mutual intention to contract.   An implied contract, in the
> proper sense, is where the intention of the parties is not expressed, but
> an agreement in fact, creating an obligation, is implied or presumed
> from their acts, as in the case where a person performs services for
> another, who accepts the same, the services not being performed under
> such circumstances as to show that they were intended to be gratuitous,
> or where a person performs services for another on request.

*Durette*, 100 P.3d at 74.

The relevant evidence upon which to apply the foregoing principles is the

June 3, 2019 letter from QMC to Kaiser that is attached to the Complaint (and the

motion for a preliminary injunction).   The letter opens by confirming the

termination of the parties' written agreements as of May 30, 2019.   Dkt. No. 1-1.

In the next paragraph, QMC "reject[s]" reimbursement practices proposed by Kaiser

---

[3]It is undisputed that an *express* emergency services contract has not existed between the parties
since May 30, 2019.   *See* Compl. at ¶¶ 19, 22, Dkt. No. 1; Mtn. to Dismiss at 6, Dkt. No. 18-1.

in a letter Kaiser allegedly sent to QMC.   The third paragraph states that, from May 31, 2019, QMC will provide emergency services to Kaiser members "at 100% of billed charges…."   The final relevant paragraph reads: "Members will be billed for any claim for services not reimbursed by Kaiser, in whole or in part, within 30 days of submission."   *Id*.

Kaiser argues that the letter summarized above plausibly suggests an implied in-fact contract because QMC expects to receive payment from Kaiser.   Dkt. No. 46 at 15.   That argument, however, is divorced from any plausible reading of the letter. Contrary to Kaiser's assertion, QMC does not *expect* to receive payment from Kaiser–that much is borne out by the statement that members will be billed for services that are not reimbursed *in whole or in part*.   In other words, Kaiser members will be billed the full amount if Kaiser reimburses nothing.

In any event, even if the Court was willing to accept that QMC expects some amount of payment from Kaiser, there would still be no implied in-fact contract under *Durette's* explanation of the concept.   The reason is straightforward and can be found in the first sentence of the explanation quoted above: there is clearly no "mutual intention to contract" under the facts here.   The letter is clear that QMC has *rejected* Kaiser's payment proposal and, as of May 31, 2019, will proceed with billing in a manner which Kaiser expressly rejects.   Put simply, both sides have

rejected each other's proposals.   In this light, the only mutual intention the parties could be construed as having is *not* to contract.

Kaiser persists, however, with its assertion that an implied contract exists because, in its view, there is a "mutual exchange of value" between the parties in the sense that QMC provides emergency medical care to Kaiser members and Kaiser pays for that care.   Dkt. No. 46 at 16-17.   Putting aside that Kaiser cites to no law that a "mutual exchange of value" would satisfy the principles set forth in *Durette*, there is no *mutual exchange* between the parties even under Kaiser's construction of the alleged relationship.   Under that construct, QMC provides value to Kaiser's *members*, while QMC receives value from *Kaiser*.   *See* Black's Law Dictionary 1178 (10th ed. 2014) (defining "mutual" as "[g]enerally, directed by each toward the other or others; reciprocal.").   Moreover, as just described, the facts reflect that there is no agreement between the parties as to any exchange that arguably may take place.   *See* Restatement (Second) of Contracts § 23 (1981) ("It is essential to a bargain that each party manifest assent with reference to the manifestation of the other.").[4]

---

[4]The Court further notes the incongruity of arguing that there is a "mutual exchange of value" here when the parties expressly disagree on the *value* of their purported mutual exchange.   Kaiser asserts that this incongruity can be ignored because the value term of the alleged contract can be supplied by the Restatement's provision concerning omitted contractual terms.   *See* Dkt. No. 46 at 16-17.   As the comments to that provision explain, however, its purpose is to supply a term that has been omitted due to parties' "fail[ure] to foresee the situation which later arises[,]" or having "no expectation[] with respect to that situation," or failing to manifest their expectations "because the situation seems to be unimportant or unlikely[.]"   Restatement (Second) of Contracts § 204

The lack of an implied in-fact contract between the parties in this case is illustrated by one of the cases to which Kaiser cites, albeit for a different purpose. The facts of the case, *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43 (Tenn. Ct. App. 2002), at least those relevant to the issue of an implied in-fact contract, are remarkably similar to those here.   In *River Park*, the defendants, known as "BlueCare," operated as a "managed care organization" or "MCO" in Tennessee under the state's Medicaid system.   *Id*. at 47-48.   BlueCare did so pursuant to a "risk agreement" with the state, which, *inter alia*, required BlueCare to pay for all medically necessary emergency services received by a BlueCare enrollee from a non-contract provider.   *Id*. at 49, 60.   In 1994, BlueCare contracted with River Park, a hospital operating in Tennessee, for the purpose of River Park becoming a participating provider in BlueCare's network.   *Id*. at 49. During the course of this contract, River Park became dissatisfied with, *inter alia*, the rate of reimbursement received from BlueCare.   As a result, River Park ultimately gave notice to BlueCare that River Park would terminate their contract effective January 1, 2000.   River Park and BlueCare, though, attempted to renegotiate through a series of meetings from October 1999 to March 2000.   Those negotiations did not bear fruit, however, and, as of January 1, 2000, River Park

cmt. b. (1981).   This is very much not the situation here, where the parties clearly foresaw the situation that currently exists, clearly manifested their expectations with respect to it, and clearly believed it was very important.   In fact, the price term appears to be the sole reason why the parties do not have a contract now.   Under these circumstances, it would be an abuse of Section 204 to do that which Kaiser proposes.

became an out-of-network provider.   Despite their failure to agree on new terms, BlueCare informed River Park that it would reimburse River Park at the same rate it had paid under their old contract.   River Park, meanwhile, told BlueCare that it would charge its standard rates for services provided to BlueCare enrollees.   *Id*. On March 2, 2000, River Park made its final proposal to settle the dispute with BlueCare, a proposal that BlueCare rejected without making a counter-offer.   *Id*. at 49-50.   Their lawsuit then proceeded.   *Id*. at 50.

With respect to whether an implied in-fact contract existed between River Park and BlueCare, the Tennessee Court of Appeals concluded that one did not.   *Id*. at 58.   The court of appeals held that, because BlueCare never agreed to any of River Park's proposals, there was "no mutual assent" between them on the rate that BlueCare would reimburse River Park for services provided to BlueCare enrollees. *Id*.

That situation could hardly be more similar to the instant case.   Patently, Kaiser and QMC have been unable, despite repeated attempts, including mediation before an assigned Magistrate Judge, to agree on a rate of reimbursement for emergency services QMC provides to Kaiser's members, and thus, there has been "no mutual assent" between the parties.   For the Court to conclude otherwise would defy logic, the facts of this case, and the reasoning of *River Park* on this issue.   The Court declines to do so.

Kaiser asserts other arguments as to why an implied in-fact contract exists, none of which carry the day.   First, Kaiser argues that, in another case involving QMC and Kaiser, QMC asserted that an implied contract existed between the parties, and thus, QMC should be "judicially estopped" from contending otherwise here.   Dkt. No. 46 at 14.   The principal problem with this argument is that the instant case is *factually different* than the one alleged in the parties' previous litigation.   In the prior case, *Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 948 F. Supp. 2d 1131 (D. Haw. 2013), QMC, as the plaintiff, alleged that it performed services for Kaiser "with the understanding between both parties that Kaiser would pay 100% of the billed charges."   *Id.* at 1146.   That is *not* what is alleged here nor could be alleged here, in light of the June 3, 2019 letter.   Here, there is no understanding between the parties on how much Kaiser will pay for the emergency services QMC provides to Kaiser's members.   Therefore, contrary to Kaiser's contention, there is no inconsistent argument in this case that might warrant the imposition of estoppel.

Second, at oral argument, Kaiser argued that consent forms QMC requires its patients to sign create an implied contract between Kaiser and QMC.   Although this argument does not appear to have been raised in Kaiser's opposition to the motion to dismiss, it is raised in Kaiser's motion for preliminary injunction, *see* Dkt. No. 29-1 at 15-16, and thus, the Court will address it for the sake of completeness.   Kaiser

argues that QMC requires patients to sign consent forms as a condition of receiving emergency care, and these forms require a patient to assign his or her insurance benefits to QMC.   Kaiser asserts that, by "trying to extract an assignment of contract benefits from its patients on their gurneys," QMC has "impliedly agreed to pursue Kaiser and not the patient for payment."   *Id.* at 15.   The consent form, however, tells a very different tale, given that it explicitly states that the person signing the form will be "responsible for paying my QMC bill in full…."   Dkt. No. 29-17.[5]   In any event, whatever the consent form may say, those statements do not get around the fact, as discussed above, that, in this case, there is no mutual assent between Kaiser and QMC, and, therefore, there is no implied in-fact contract.   *See River Park*, 173 S.W.3d at 58; *Durette*, 100 P.3d at 74.

## B.   <u>Implied In-Law</u>

Kaiser argues that an implied in-law contract exists between the parties for two reasons: one based upon statute and one based upon the common law.   Dkt. No. 46 at 17-19.   The Court addresses each in turn.

### 1.   <u>Statute</u>

---

[5]The Court notes that the unsigned consent form Kaiser has submitted for the record states that it is a "consent to treatment and terms and conditions of service" for "Outpatient Services[.]"   Dkt. No. 29-17.   Even if the Court was willing to assume that this form is provided to patients being treated for emergency services, such as those at issue in this case, it is far from clear whether the consent form has been signed by any of Kaiser's members treated at a QMC facility for emergency services.

Kaiser argues that certain statutes create an implied in-law contract because QMC is required by statute to provide emergency services to any patient suffering from emergency medical symptoms, and Kaiser has a statutory duty to cover and pay for emergency services provided to its members.   *Id*. at 18-19.   Citing, in particular, *Bell v. Blue Cross of Cal.*, 31 Cal. Rptr. 3d 688 (Cal. Ct. App. 2005), Kaiser asserts that courts in California recognize that statutory obligations to provide medical services and pay for them can create an implied in-law contract, and that those principles are no less applicable here.

As an initial matter, the Court agrees (and QMC does not dispute) that *QMC* is statutorily required to provide emergency services to a person suffering a medical emergency.   42 U.S.C. § 1395dd(a).   However, Hawaiʻi law is not the same as California law with respect to *Kaiser's* statutory requirements.   Although Kaiser asserts that it has a statutory requirement to cover *and pay* for emergency services, Kaiser does not attempt to contend that it has a statutory requirement to pay QMC. The reason is that none of the statutory provisions to which Kaiser cites state that it has such an obligation.

Specifically, Kaiser relies upon Sections 432D-1 and 432D-14 of the Hawaiʻi Revised Statutes.   Dkt. No. 46 at 18-19; Dkt. No. 29-1 at 16-17.   In pertinent part, Section 432D-1 provides that a "health maintenance organization" (HMO), such as Kaiser, "undertakes to provide or arrange for the delivery of basic health care

services to enrollees on a prepaid basis, except for enrollee responsibility for copayments, deductibles, or both."   Further, "basic health care services" are defined as including, *inter alia*, "emergency care" – the care at issue in this case.   Section 432D-14 provides, in pertinent part, that an HMO's operating license can be revoked or suspended if the HMO does not provide or arrange for emergency care.   Thus, at most, Sections 432D-1 and 432D-14 collectively provide that, for Kaiser to be and remain an HMO, it must provide or arrange for emergency care.   In other words, the statutory provisions on which Kaiser relies do not even begin to address *whom* Kaiser must pay for emergency services or even Kaiser's obligation to pay for the same.

The statutory situation in Hawaiʻi, therefore, is materially different than in *Bell*.   In *Bell*, the court explained that California had enacted a law, Section 1371.4, that "impose[d] a mandatory duty upon health care plans to reimburse non-contracting providers for emergency medical services."   *Bell*, 31 Cal. Rptr. 3d at 692.   Moreover, the State of California's Department of Managed Health Care had issued regulations providing that "reimbursement" of non-contracting providers meant that a health care plan "must pay the reasonable and customary value" of the services rendered.   *Id*. at 691-692.   Thus, in California, not only was there a statutory obligation that a health plan pay for emergency services, there was also a statutory obligation to pay non-contracting providers, as well as regulations in place

to determine the amount of any payments.   No one in this case, including Kaiser, suggests that such a statutory and regulatory framework exists in Hawai'i.   Without something even approaching California's framework, and without Kaiser pointing to any applicable case law or statutory provisions, this Court finds that Hawai'i's statutory scheme does not create an implied in-law contract between Kaiser and QMC under the circumstances of this case.[6]

## 2.   **Common Law**

Kaiser also turns to the common law for the proposition that an implied in-law contract exists here.   Kaiser asserts that, pursuant to Section 114 of the Restatement (First) of Restitution, a person who performs the duty of another is entitled to restitution from the other if the person acts to prevent serious bodily harm and with the intent to charge.   Dkt. No. 46 at 17-18.   The problem with this argument is that Kaiser is attempting to shoehorn itself into a legal concept to which, factually, it does not fit.   Section 114 provides for a person *who performs* a duty of another to be entitled to restitution.   Here, *Kaiser* has performed no duty of another.   Instead, *QMC* is the party that has performed a duty – the provision of emergency services.[7]

---

[6]For a similar, but not identical, reason, *River Park's* finding – that an implied in-law contract existed – is inapplicable here.   In *River Park*, the court found that an implied in-law contract existed because the health care plan had entered into a contract with the state, requiring the plan to pay for emergency services, whether rendered by an in-network or out-of-network provider. *River Park*, 173 S.W.3d at 59.   Here, no such contract with Hawai'i is alleged to exist.   This is presumably why Kaiser does not cite to *River Park* for this holding.

[7]The Court notes that this is a duty that federal and state law requires QMC to perform.

Kaiser cites no case or guidance from the Restatement suggesting that Section 114 can be used *against the duty performer* in the fashion it asserts.   *Cf. Bell*, 31 Cal. Rptr. 3d at 221 (allowing a *doctor's* implied in-law claim to proceed *against* a health care plan).   Because this case does not involve a claim being asserted by the party who performed the alleged duty of another, the Court cannot find that an implied in-law contract exists based upon Kaiser's theory of the common law.

### C.   Summary

For the reasons discussed above, the Court finds no implied in-fact or implied in-law contract between Kaiser and QMC.   The Court now turns to whether the absence of a contract between the two sides should result in dismissal of all (or some) of Kaiser's four claims and, if so, whether leave to amend is warranted.

## II.   Dismissal or Not?

QMC argues that all of Kaiser's claims depend on the existence of a contract between the parties and, because there is no such contract, all of Kaiser's claims fail. Dkt. No. 18-1 at 1.   In its opposition, Kaiser asserts that it is not precluded from bringing this case even if no contract exists.   Dkt. No. 46 at 20-21.

In reviewing these arguments, the Court considers Kaiser's claims in two distinct groups.   First, Claims One and Two (respectively, for declaratory and injunctive relief) relate to whether QMC can balance bill Kaiser's members for emergency services.   Second, Claims Three and Four (also, respectively, for

declaratory and injunctive relief) relate to the amount QMC can charge for the emergency services it has rendered.   The Court addresses each set of claims in turn.

### A.   Claims One and Two – Balance Billing

As alleged in the Complaint, Kaiser's balance billing claims are subject to dismissal in light of the Court's findings that no contract exists between the parties. This is because, as alleged, these claims are premised upon the existence of a contract.   *See* Compl. at ¶¶ 25-26.[8]   Nonetheless, assuming that these claims could be amended to encapsulate the argument Kaiser asserts in this regard, the Court will address the same for purposes of whether amendment would be futile.

Kaiser argues that QMC should be prohibited from balance billing its members because the California Supreme Court, in *Prospect Med. Grp., Inc. v. Northridge Emergency Med. Grp.*, 198 P.3d 86 (Cal. 2009), held that there is a general prohibition against balance billing emergency patients, and Hawai'i has a similar or "nearly identical" statutory scheme.   Dkt. No. 46 at 20-21.

As discussed above, however, the Court disagrees that, on the subject of payment and billing for emergency services rendered by non-contracting providers, Hawai'i and California's statutory schemes are "nearly identical" or similar.   The decision in *Prospect* shows why.   As the California Supreme Court explained,

---

[8]Paragraph 25 of the Complaint is demonstrative in this regard: "Under Hawai'i law…hospitals performing services pursuant to contracts, including *implied contracts*, must hold patients harmless for any amount owed by their carrier and are prohibited from attempting to collect that amount from the patient."   Compl. at ¶ 25 (emphasis in original).

California has legislatively (1) banned balance billing when an HMO is contractually obligated to pay, (2) required health care plans to pay non-contracting providers, (3) required HMOs to provide a dispute resolution mechanism to non-contracting providers for purposes of resolving billing disputes, and (4) prohibited HMOs from engaging in unfair payment patterns when disputing reimbursement with non-contracting providers. *Prospect*, 198 P.3d at 91-92. The *Prospect* court concluded that, under those circumstances, it was reasonable to interpret California's law as prohibiting non-contracting providers from balance billing. *Id*. at 92.

Here, Hawaiʻi certainly prohibits balance billing a patient when an HMO and a provider have a contract. Haw. Rev. Stat. § 431:26-104(b). But, that is the only relevant similarity between Hawaiʻi's and California's laws. Put simply, Hawaiʻi law is utterly silent on *any* matters that may arise, such as billing disputes, between *non*-contracting providers and an HMO following the provision of emergency services to the HMO's members. Thus, unlike in *Prospect*, here, there is no canvas upon which the Court can fill-in a reasonable interpretation of a statutory scheme because there is no scheme in the first place.[9] Whether the Hawaiʻi legislature opts to remedy that situation is, of course, beyond this Court's purview.

---

[9]Although it is not necessary for the Court's rejection of Kaiser's argument, to the extent Hawaiʻi law can be construed as suggesting anything in this regard, Section 431:26-104(c) is potentially illuminating. Section 431:26-104(c) provides that "[e]very contract between a health carrier and a participating provider shall provide that in the event of a health carrier or intermediary

In summary, because no contract exists between the parties here, Claims One and Two must be dismissed.   In addition, it would be futile to amend these claims so that they were based upon "a general prohibition against balance billing emergency patients," as Kaiser asserts in its briefing, because there is no such general prohibition in Hawai'i.

## B.   Claims Three and Four – Charges

As an initial matter, the Court observes that Kaiser's argument, as to why this case can proceed even if no contract exists between the parties, does not readily appear to encompass the subject matter of Claims Three and Four.   Instead, Kaiser's argument, at least on its face, appears to only relate to its balance billing claims.   *See* Dkt. No. 46 at 20-21 (arguing that there is "a general prohibition against balance billing emergency patients.").   Nonetheless, construing Kaiser's argument liberally, the Court will assume it is meant to encompass Claims Three and Four as well.

The Court can only liberally construe so much, however, and, with respect to Claims Three and Four, which concern whether Kaiser need only pay some

---

insolvency or other cessation of operations, the provider's obligation to deliver covered services to covered persons *without balance billing* shall continue *until the earlier of*: (1) [t]he termination of the covered person's coverage…or (2) [t]he *date the contract between the carrier and the provider…would have terminated if the carrier or intermediary had remained in operation*." (Emphasis added.)   While the circumstances here do not involve the insolvency or other cessation of Kaiser's operations, the foregoing could be construed as suggesting that, when a contract expires, a provider *may* balance bill a covered person for covered services.   The Court does not make any express finding in that respect, however.

"reasonable value" for QMC's emergency services, Kaiser's argument simply does not apply.   Notably, the Court has been pointed to no law suggesting that there is a "general" requirement that only the "reasonable value" of emergency medical services be paid or a "general" prohibition against charging the "full" rate for such services.   Instead, "reasonable value" may apply when an implied contract exists or when it is the regulatorily mandated amount of payment.   *See, e.g.*, *River Park*, 173 S.W.3d at 59-60 (affirming the trial court's finding of "a contract implied in law, i.e., unjust enrichment," and remanding to determine "a reasonable rate of reimbursement"); *Prospect*, 198 P.3d at 90 (explaining that regulations in California require an HMO to pay "the reasonable and customary value for the health care services rendered").   Here, as discussed, there is no contract between the parties and no regulation or law in Hawaiʻi that mandates the level of payment or the amount that can be charged for emergency services in the context of this case.   As a result, the Court finds that Claims Three and Four cannot proceed with or without amendment.

### III.   <u>Summary</u>

In light of the foregoing findings, the motion to dismiss, Dkt. No. 18, is GRANTED.   In addition, because amendment would be futile, this case is DISMISSED WITH PREJUDICE.   As a result, the motion for a preliminary

injunction, Dkt. No. 29, is DENIED AS MOOT.   *See Global Horizons*, 510 F.3d at

1058.[10]

## **CONCLUSION**

While the Court finds that this case should be dismissed with prejudice, it is

perhaps self-evident that there are no *real* winners from the foregoing disposition.

Any victories are, at best, pyrrhic.   For example, should QMC choose to balance

bill Kaiser's members for emergency services, QMC is unlikely to receive glowing

attention from interested observers.   In terms of dollars and cents, *eventually*

someone or some entity will need to pay (or be ordered to pay) for the services QMC

has rendered to Kaiser's members.   It is highly debatable, though, that the payment

made will be 100% of billed charges, as QMC's June 3, 2019 letter describes.   Of

course, there is a chance that 100% may be required, but, *inter alia*, it may be a time-

and cost-intensive road to reach that point – a road that may need to be re-traveled

many times over.   This is, presumably, why parties such as Kaiser and QMC

ordinarily negotiate a contract.   Alternatively, this may be why a state such as

California has enacted a detailed legislative and regulatory framework for situations

such as this.   As discussed, without either here, there is no relief the Court can

provide given the posture of this case.   The Court leaves for the parties to decide

which course – contractual negotiation, legislative lobbying, potentially renewed

---

[10]So it is clear, the Court makes no findings with respect to the factors for a preliminary injunction *other than* with respect to the merits of Kaiser's claims.

litigation, disputing each and every bill, or a combination of the above – is best for them.   *One* course should be considerably more timely, efficient, cost-effective, and, frankly, sensible for all concerned than the others, but it remains to be seen whether the parties' responsible decisionmakers see it the same way.

For the reasons set forth herein, the motion to dismiss, Dkt. No. 18, is GRANTED, and this case is DISMISSED WITH PREJUDICE.   The motion for a preliminary injunction, Dkt. No. 29, is DENIED AS MOOT.

The Clerk is instructed to enter Judgment in favor of Defendants The Queen's Medical Center, Inc., North Hawai'i Community Hospital, Inc., and Molokai General Hospital and then to close this case.

IT IS SO ORDERED.

Dated: October 31, 2019 at Honolulu, Hawai'i.


Derrick K. Watson
United States District Judge